# Wynn vs. Morris et al.

Before any claimant can question the sufficiency of the title of a pre-emptor of the public lands of the United States, to whom a patent has been issued by the Government, he must show such title in himself as, but for the interference of such preemption, would entitle him to the land in controversy.

Such title is not shown by proof that the claimant, having had the land in possession and cultivation for several years, under a purchase from one to whom the pre-emptor had sold her improvement, after abandoning the land and the country, had made an agreement with the Governor, who had the direction of the selection of the 500,. 000 acre grant by Congress to this State: that the tract in controversy should be selected by the locating agent, as a part of said grant, and that he should have the privilege of purchasing it upon such terms as the Legislature might prescribe; that the tract was so selected; but afterwards, upon the allowance of the pre-emption, and because of such allowance, the selection was withdrawn by the Governor before the Legislature had prescribed the terms of purchase in such cases, and other lands selected in lieu thereof.

*Quere*: After the vesting of a pre-emption right in the unsurveyed public lands, under the act 29th of May, 1830, and before the act of 14th July, 1832, extending the time in certain cases for making the proof, the settler abandons the land and becomes a citizen of a foreign country, and so continues, is the pre-emption right forfeited? Or would a parol sale of the improvement, in such case, and the continued possession and cultivation of another under such sale, affect the original settler's right to prove up a pre-emption? See *opinions of Mr. Justice Scott and Mr. Chief Justice English.*

*Appeal from the Lafayette Circuit Court in Chancery.*

Hon. Shelton Watson, Circuit Judge.

Pike, for the appellant. Lands selected by the State agents as part of the 500,000 acre grant, vested in the State as soon as selected; or, to avoid any doubt, we will say as soon as the list or evidence of selection was filed with the Register of the proper Land Office.

In June, 1842, if not on the 16th of May, this tract of land became vested in the State, as part of the 500,000 acres, unless. the pre-emption of Mrs. Taylor prevented. This selection, however, being made for the benefit of Wynn, and with his consent, under the agreement between him and the Governor, the State was bound to sell him the land, if he should agree to the price and terms to be fixed by her. She held the title as trustee for him. Wynn, therefore, the pre-emption not in the way, had divested the General Government of title, and was himself entitled, in preference to all the world, to buy of the State. There can, consequently, be no question that he has the necessary interest to authorize him in equity to question the pre-emption which prevented the completion of his title. His interest is, at least, equal to that of a pre-emption claimant.

The question in the case, is this:

If a person obtained a pre-emption right under the act of 29th May, 1830, to a particular tract of land, by cultivation in 1829, and possession on the day of the passage of the act, but afterwards, and before survey of the land, and of course before proving the pre-emption, ran away from the country, abandoned the land, sold or gave away the improvement, or voluntarily put a third person in possession, with the intention of never returning, went to Mexico, a foreign country, and there settled and became a citizen of its Province of Texas—could this citizen, first of Mexico and then of Texas, returning for a day or two only, be entitled to prove up and have the benefit of his or her pre-emption, against a person long in peaceable possession of the same land; when, immediately on the abandonment in 1830, the third person to whom he or she sold, or gave, or voluntarily delivered the improvement, took possession, sold it afterwards to her brother, with the consent of her husband, and that brother sold to another, and he to another still, and so onward until it was bought by the person in possession when the pre-emption was proven — these different holders having regularly cultivated the tract from 1831 to 1842, and she never having, in the mean time,

set up any claim to it, or even re-visited the country—and having, when she did return, done so for the sole purpose of proving her pre-emption without intention of remaining, and immediately returned to Texas?

We maintain, *First.* That the *continuance,* as well as the creation, of a pre-emption right, under the act of 1830, was so inseparably connected with, and dependant upon, actual possession by the pre-emptor of the specific land, that if a person, fully entitled to a pre-emption under that law, on the 29th May, 1830, afterwards abandoned such possession, or yielded it to another, his right of pre-emption *eo instanti* expired.

*Second.* That if such person, so entitled, abandon the land and leave it vacant, and another person take peaceable possession, the first holder is forever afterwards *estopped* from setting up his pre-emption right against the other person so in possession, or any other person who may afterwards take possession, if such other person gains title, legal or equitable, to such land from the Government, or a pre-emption right to it, or right of entry.

*Third.* That if a person so entitled to pre-emption, afterwards, and before proving it up, ceased to be a citizen of the United States, and became a citizen of, and resident in a foreign country, he thereby lost his pre-emption right, and certainly Keziah Taylor ceased to be a citizen of the United State before she proved up her pre-emption.

The different pre-emption acts from 1814 to this time, constitute, at least in some respects, a system; are based upon certain principles of public policy and general utility : and, of course, like other laws so circumstanced, they are to be construed with reference to such system and policy.

The object of all these laws is to secure to persons who have labored on, improved, and added value to particular tracts of public lands, the avails of their labor, by preventing other persons from over-bidding them at the public sales, or entering, by superior diligence thereafter, the land possessed

by them: and so ousting them of possession. Continuing posession is essential to give a right to the claim demanded. It is on "settlers and occupants" of the lands, that these laws confer their benefits : the right to the benefit depends upon the *character* of the party. *Acts of 29th May*, 1830, 4 *Stat. at Large* 421; *Act of 14th July*, 1832, *Ib.* 603 ; *Act of 19th June*, 1834, *Ib.*, 678 ; *Act 22d of June*, 1838, 5 *Ib.*, 251, *Act of 1st June*, 1840 *Ib.*, 382; *Act of 4th September*, 1841, *Ib.*, 455, 6, 7.

And we insist that the act of 1830 was not in force in December, 1842; that Mrs. Taylor's pre-emption claim was good for nothing; and, at that time, no pre-emption were allowable, except where the claimant *then* actually lived on the lands, and, then only under and in accordance with the act of September 4, 1841.

And that if we are mistaken as to this, still the acts of 1838, 1840, and 1841, expressly confine the benefits of the act of 1830 to actual settlers, being personally on the land when applying to purchase, and cultivating exclusively for their own use and benefit, and certainly not for citizens of foreign countries, domiciled and resident abroad.

It has been insisted on the other side, that if a citizen does change his *status*, and become, in the fullest manner, an alien friend, he does not thereby lose the title to property previously owned by him—that a vested *title* is not thereby divested; and as little will a vested *right* be.

Mrs. Taylor had no *title* to anything on the 29th May, 1830. She had (or would have had if the land had been surveyed,) the *right* to prove up a pre-emption; and, if sale of it had been ordered, the right, under her pre-emption, to purchase and enter the quarter section, at $1 25 per acre.

That law was in force only a year. When it expired, still no survey had been made; and she had, in the mean time, abandoned the land and moved away. At the expiration of the law, on the 29th May, 1831, her right expired, even if she did not lose it by abandonment and removal.

On the 14th of July, 1832, more than a year after she had re-

moved, and when Cryor was in possession of the land, a law was passed which we have already cited.

It was by virtue of the act of 14th July, 1832, alone, if by *any* law, that *any* pre-emption could be proven in December, 1842, under the of 29th May, 1830. In July, 1832, Mrs. Taylor was not a settler and occupant of the public lands. She had ceased to be so more than a year before.

Certainly no such construction of a law intended to encourage settlement on, and cultivation of the public land, increase of population, and enlargement of the National resources, as that it was intended to divide out, at minimum price, these lands, to the citizens and subjects of foreign powers, or to our citizens who chose to abandon our own flag, and assume a new allegiance elsewhere, can be allowed. That would be contrary to the policy of our whole land system; contrary to our National interests, and at variance with the policy of all civilized governments. Above all, it would contravene the very objects of the law, as it does in this case, by enabling an entire stranger and subject of a foreign power, to turn out the actual settler on the public lands, and possess himself of the fruits of his labor; when the law was enacted for the very purpose of protecting such possession, and securing to the settler those fruits. *Smith vs. Brown,* 1 *Yeates* 575 *; Magens vs. Smith,* 4 *Binney* 76 *; Cluggage vs. Duncan,* 1 *Serg. & Rawle* 120 *; Watson vs. Gilday,* 11 *Ib.* 340.

On every ground, Wynn should have been relieved. The State had selected it for him; it was his, she holding as trustee for him, and no further act was needed to pass the land from the United States. This citizen of a foreign Republic comes forward and claims a superior equity, by virtue of an existing pre-emption; she obtains a deed from the Government, but it is apparent that the State, for Wynn, has the elder legal title; and therefore the equities must be compared. In that contest her pre-emption must succumb: because,

To maintain a pre-emption right, there must be continued possession.

The right is a *jus vagum*, which could be abandoned, and she did abandon it, both by going away, and selling or giving the improvement to another.

She is estopped to set up her claim, because she has induced Wynn to buy and settle on the land, and her subsequent assertion of her claim was a fraud.

She ceased to be a citizen of the United States, and became a citizen of a foreign country.

CURRAN & WATKINS and GALLAGHER, for the appellee.    Wynn has failed to show any such title in himself as authorizes him to maintain this suit.    Even if Morris' patent was set aside, the land would neither vest in Wynn nor the State.    No matter how defective or illegal the patent may be, Wynn has no right to call for an investigation of it, until he first shows that if the patent was out of the way, the land would belong to him.

Wynn alleges that the land was located with his assent, as a part of the 500,000 acre grant, with the understanding between him and the Governor, that he should have the right to purchase from the State upon such terms as the Legislature might fix. These selections had to be confirmed by the commissioner of the General Land Office; and the selection of this tract was rejected by him, and the State never acquired any title thereto; nor did Wynn offer to comply with the terms prescribed by the Legislature.    If the patent is set aside, the land would neither vest in the State, nor in Wynn.    It could not vest in the State, for she abandoned the selection and located other lands in lieu of it, nor could it vest in Wynn as her grantee.    This shows that he does not occupy such position as entitles him to be heard.    For however fraudulent Morris' title may be, Wynn has no right to call upon the courts to adjudicate in relation to it, unless he first establishes that he has such a title as would hold the land in case Morris' patent was set aside.

The supposed agreement between Wynn and the Governor, was really no agreement or contract, in any sense of the word:

because the Governor had no authority to make it. It was, at the most, a mere understanding—for aught that appears, a parol request or assent on the part of Wynn that the land might be selected, and altogether dependent for its ratification by the Legislature.

If, as alleged in the bill, the State abandoned the selection, because of the allowance of the pre-emption, she had a perfect right with the assent of the United States authorities, to do so, for that or any other cause, or for no cause, and the subsequent act of the Legislature, as far as this selection is concerned, had no application to Wynn whatever. His right to the specific land, was not even inchoate, because there never was any obligation on the part of the State to sell to him.

Though Mrs. Taylor parted with the possession, it is more than doubtful whether she ever *sold* even the improvement, much less her right of pre-emption, which is not pretended. It would be difficult to make out a *sale* of any kind upon the evidence, of which a specific performance could be enforced. But a sale of an improvement on public land, is something very different from the sale of a pre-emption right. *Pelham vs. Wilson*, 4 *Ark.* 289 ; *Pelham vs. Floyd*, 4 *Eng.* 530, cited in *Brock vs. Smith*, 14 *Ark.* 434. Unless Wynn only bought or acquired the mere improvement or possession, a chattel interest, transferable by parol, it is manifest that he has failed to connect himself with Mrs. Taylor by legitimate proof of any claim of title derived from her.

We submit that if Mrs. Taylor cultivated in 1829, and was in possession on the 29th May, 1830, her right *vested*, subject, only to be divested in the event that she failed to make proof of those facts within the time prescribed by law. That a pre-emption right is a vested right, and overrides all other intermediate claims, and that a continuance of possession is not necessary, see the case of *Lytle et al. vs. The State of Arkansas et al.*, 9 *How. Rep.* 314 ; in which there was no pretence that Cloyes remained in possession. See, also, *Opn. of Attorney General Berrien, Inst. & Opns. p.* 60, *No.* 42 ; *Inst. & Opn., p.* 609, *No.* 565.

An attempt is made to draw a distinction between a *right* and a *title* to land. We cannot conceive of a case where a man would have a *right* to land without a *title* of some kind: nor can we perceive the distinction between a *right* and a *title* to property.

Admitting that Mrs. Taylor parted with her right to the possession by valid contract, which the proof fails to show, and that she removed to Texas for the purpose of residing there or of expatriating herself, if under the act of 1830 she had a vested right to the land by the facts of her cultivation in 1829, and possession on the 29th of May, 1830, it was not divested or forfeited by her removal from the land or change of domicil to a foreign country. 2 *Opns. & Inst., No.* 42, *p.* 62; *Ib., No.* 565, *p.* 609, *Ib. No.* 55, *p.* 82 ; *Murray vs. Fishback,* 5 *B. Mon.* 406. Removal to a foreign country, would no more divest a right, than it would a title to property. Right and title are convertible terms; or one is the substance and the other the form. The right of a pre-emptor is vested, whenever the facts of cultivation and possession bring him within the terms of the law. And the act of 1830 neither requires a continued residence in the State, nor upon the land.

The question of abandonment is peculiarly between the claimant and the Government, and one which when presented, it was the province of the President and his subordinates at Washington City, to decide.

The appellant's counsel argues, at great length, against the validity of the pre-emption of Mrs. Taylor, upon the ground that neither the act of the 14th July, 1832, nor any of the subsequent pre-emption laws, extended the time within which pre-emptors under the act of 29th of May, 1830; could prove up their pre-emptions, where the public surveys were not made and the plats returned, within the life of those laws. We may summarily dismiss this as an exploded theory. *Gaines vs. Bale,* 15 *Ark.*

The possession of public land does not constitute notice of an adverse claim, when the possessor has no vested right as against the Government: nor is the claimant bound to give notice of his

claim either by continued possession or otherwise. The only condition upon which it may be defeated, being the failure to make proof and payment within the time limited by law, actual residence on the tract cultivated and possessed not being necessary.

And as between the claimant and the Government, and as a consequence all persons claiming under the Government, the adjudication of the Land Officers and the decision of the General Land Department awarding the patent, are conclusive upon the whole world, and can only be judicially enquired into at the suit of any individual claimant who shows a prior and vested equitable right *as against the Government itself*.

Mr. Justice Scott delivered the opinion of the Court.

Wynn filed his bill in chancery in the Lafayette Circuit Court, praying that Morris, as to the tract of land in controversy, might be declared a trustee for him, and decreed to hold the title as such, and convey it to him upon receiving the sum of three hundred and twenty dollars, together with interest at the rate of six per centum per annum, from the 16th of May, 1842, which he tendered, or such other sum as the court might decree; and for an injunction, which was granted him, against a judgment at law in ejectment obtained by Morris for the land in controversy, and for rents and profits. Upon the hearing, all relief was denied; the injunction was dissolved; $1320 60 decreed to Morris for damages upon the dissolution, and the bill was dismissed at the cost of Wynn, who appealed to this court.

The land in controversy is the north-west quarter of section eighteen, in township sixteen, south of range twenty-five west, in Fisher's Prairie, south of Red River. On the northern boundary line of this tract, and adjoining it, lies the south-west quarter of section seven in the same township and range.

These lands were surveyed by authority of the General Government in the years 1840 and 1841. Up to the year 1842, they remained public lands. On the 16th day of May, in the last named

year, the tract in controversy was selected by one of the duly authorized locating agents for the State of Arkansas, as a part of the 500,000 acres granted by Congress for Internal Improvements, by the act approved 4th September, 1841, and authorized to be selected by the Governor, by act approved the 19th March, 1842. The selection of this tract was made by the concurrent act of Wynn and the locating agent of the State—Wynn assenting to and requesting the selection with the view to secure his improvement, he having the whole of this tract then in cultivation. The Governor having by his memorandum for the locating agent, of the date of the 2d of April, 1842, and by his further instructions bearing date the 15th of that month, proposed to the planters on Red River, to locate their improvements, and such other lands as they might desire to purchase, the terms and price to be fixed by the Legislature at the ensuing session, to begin in November next following. This selection, with others, was reported to the Governor, by the locating agent, the 2d of June, 1842, and by the Governor reported on the 8th day of that month both to the Register of the Land Office at Washington, Arkansas, (in which district the land was situate) and to the Commissioner of the General Land Office at Washington City.

This arrangement, so proposed by the Governor and acceded to by Wynn, who was one of the planters on Red River contemplated, was substantially ratified by the act of the Legislature of Arkansas, approved the 31st December, 1842, entitled "an act for the benefit of such persons as have settled on, or have made improvements on the public lands of this State," &c., (*Pamphlet Acts of* 1842, *p.* 42), by which the Governor was authorized to locate, as part of the 500,000 acres, lands on which persons had made, or might make improvements, on their written assent and request, and application, if such persons would agree to pay the State two dollars per acre, executing bonds for the same, payable in ten equal annual instalments, &c., on which the Governor to issue certificates agreeing to make deeds on full payment. The quantity so to be entered and purchased by any one person, was

limited to 320 acres, and all the benefits of the act were extended to persons settled on any of the lands already selected.  And by a supplemental act approved the 4th February, 1843, such persons might have selected and purchased an additional quantity, not exceeding twelve hundred and eighty acres, the price of such additional lands to be at five dollars per acre.  *Id., p.* 159.

By these means, had this selection and location been ratified by the authorities of the General Government, Wynn would have obtained the tract of land in controversy at the price of two dollars per acre, payable in ten equal annual instalments, with interest at the rate of six per centum per annum.

But within one year after the plats of survey were returned, as allowed by the act of 1832, to wit : on the 9th of December, 1842, Keziah Taylor appeared in proper person, before the Register and Receiver at Washington, Arkansas, and upon the usual showing of cultivation in 1829, and possession on 29th May, 1830, was allowed to enter and pay out the land at the minimum price of the General Government, and obtained the usual Receiver's receipt therefor, upon which a patent issued in her name on the 22d of February, 1844.   This pre-emption entry, in the language of the Commissioner of the General Land Office, "nullified" the previous selection and location made at the instance of Wynn by the State of Arkansas, and constitutes his main grievance.

Keziah Taylor having made her proof and payment, and received her certificate of purchase on the 9th day of December, 1842, on the next day, by her deed of that date, conveyed the land in controversy to William F. Morris, and it is under this conveyance he sets up his claim in the premises.   On the 24th of the same month, Wynn wrote to the Commissioner of the General Land Office, alleging that he had "just been informed that Keziah Taylor, a resident of Texas, had appeared before the Register and Receiver, and had made the entry, &c., that she had been absent from the United States some ten or twelve years— had sold the improvement on the lands in question, previous to her leaving, under which by a chain of purchase, he (Wynn) had

obtained the possession, and had been cultivating the land seve-ral years without before ever hearing of any adverse claim to it. The Commissioner of the General Land Office, by his letter of the 19th of January, 1843, to the Register and Receiver at Washing-ton, Arkansas, reciting these facts, and suggesting that if Keziah Taylor "ever had any claim, she had sold the same and yielded possession by abandonment of the premises for more than ten years," directed an examination into the alleged facts, and that the evidence should be transmitted to him with the opinion thereon of these officers. Under date of 12th September following, these officers transmitted to the Commissioner the depositions of Cryer, Bales, and Abrahams, touching the facts in controversy, and a deed from Andrew Hemphill to Samuel P. Carson, for the im-provement upon the lands in question; and another deed from Buzzard to Wynn, for the same, in which is recited the sale from the executors of Carson to Buzzard. But they give no opinion upon this additional evidence, or that theretofore taken, except as to cultivation in 1829, and possession the 29th May, 1830, which they held well sustained, being of opinion that it was not compe-tent for them to enquire of any other facts, and that "any act of sale, removal, or abandonment could not be enquired into, or the consequences determined by a subordinate branch of the execu-tive department, but should be enquired into by the judiciary, and were "therefore of opinion, from the law and the evidence in the case, that the party aggrieved should seek his remedy else-where."

On the 8th of February, 1844, the Commissioner of the Gene-ral Land Office, " upon a careful examination of the testimony," saw no ground to justify any action in behalf of Wynn, and placed the certificate of purchase in favor of Keziah Taylor on file for patenting.

In reference to occupancy and possession of the tract of land in controversy, the facts appear to be that about the year 1821, William Hemphill settled on the south-west quarter of section seven, and soon after extended his improvement on to the land

28B

in controversy. That in 1824 or 1825, he departed this life, leaving a widow and two children (one of whom died) in the possession of his improvement. His widow, Keziah, now Keziah Taylor, remained there, and in 1826 or 1827, married Thomas Jacobs, who lived there until his death in 1828, after which his widow, Keziah, remained there until after the 29th May, 1830, perhaps until the fall of that year, or until the spring of 1831. Her cultivation of the tract of land in question in 1829—either by herself, or some one for her—and her possession of it on the 29th of May, 1830, may be regarded as fully enough established, her residence all the time being upon section seven.

In the fall of 1830, or spring of 1831, she clandestinely left the United States, expressing her intention never to return again, and settled in Texas, where she soon after married a man named Taylor. When she left the United States, she started late in the evening, and traveled through the woods to elude observation, that she might be enabled to get to the "Spanish country," as she called it, without being stopped. She carried her children with her and a negro girl slave belonging to the estate of her first deceased husband, to avoid, as she said, the surrender of the slave to the administrator of that husband. She also took with her everything she had, except a few articles, which she gave to the witness, who was her pilot through the woods, and until she reached the Sabine river, giving to him also her stock of hogs for his services, leaving her cattle in the range, and the improvement on the land in question, in the possession of Alexander P. Bales, to whom she informed the witness, who was her pilot out of this country, that she had sold it for $50, but would give it to him (the witness) if he would accept of it, as she never intended to return, and Bales had often disappointed her. Bales, however, testifies that she gave him the improvement as compensation for collecting, keeping together and salting the cattle she had left in the range, until the ensuing fall, when he was to drive one-half of them to her in Texas, and was to have the other half for doing so.

Immediately after Mrs. Taylor left, Bales took possession of the

improvement, and resided on it eight or ten months, when Taylor, who had, in the mean time, become the husband of Keziah, came to see him, and desired him to give up to him (Taylor) his interest in the improvement and cattle, which he refused, having, as he alleged, failed to carry one-half of the cattle to Texas in accordance with his agreement, because they had been detained by the sheriff of Lafayette county, on account of some claims againt Mrs. Taylor. But he went with Mr. Taylor to Morgan Cryer, who was the brother of Mrs. Taylor, and upon a compromise, he sold his interest in the improvement and the cattle to Cryer, for fifty dollars, Mr. Taylor being present at the sale and compromise.

Very soon after this, Cryer took possession of the improvement, and sold it to Andrew Hemphill. Hemphill afterwards sold it to Samuel P. Carson, having himself made two crops on it. Carson died in 1837 or 1838; and in 1839 the improvement was sold by his executor, under the statute of Arkansas, as a part of his estate, and purchased by Charles Carson, who immediately sold it to Jacob Buzzard; and he in 1840 sold it to the complainant, Wynn, who has ever since had the whole quarter section in cultivation.

Wynn, in 1835, purchased from Joseph Jones an improvement which Massack H. Jones had sold, in 1833, to Jones, on the north-west and north-east quarters of section eighteen, and on which Jones had lived and cultivated until he sold to Wynn; which, added to his purchase from Buzzard, gave him the peaceable possession of the entire tract of land in controversy, which he held from that time forward.

It thus appears, that from the time of Mrs. Taylor's removal from the United States, until her appearance at the land office to make her pre-emption claim, was a period of twelve years. And there is no evidence that any claim to the land in controversy had been made in her behalf for nearly eleven years. During all this time she had been permanently residing in Texas, having become a *feme covert* there during the first year of her residence.

Under this state of facts, Wynn claims the right to question the

title of Morris to the land in controversy, derived by deed from Mrs. Taylor, the patentee.

From the course of the argument of his counsel, and his tender of two dollars per acre to Morris, with interest from the 16th of May, 1842, (the day when the land was selected as a part of the 500,000 acre grant by the agent appointed by the Governor,) it would seem that he claims this right through the State of Arkansas. And he insists that his interest, thus acquired in the land in controversy, "is at least equal to that of a pre-emption claimant." Because, as he contends, immediately upon the selection by the State's agent, or at least as soon as the list or evidence of the selection had been filed with the Register of the proper land office, (which in this instance was in June, 1842,) the land vested in the State of Arkansas, who, from that time forward, held it as trustee for him, in case he should agree to, and comply with the terms of sale and purchase afterwards to be fixed by the Legislature. The Legislature did afterwards, substantially, ratify the arrangement between the Governor and the planters on Red River, under which the selection in question had been made, by the act approved the 31st December, 1842, and the supplemental act approved the 4th February, 1843, and fixed the terms of sale and purchase, which were provided for in that arrangement; but there is no pretence that Wynn ever complied with these terms, or offered to comply with them, unless his tender to Morris, in his bill of $2 per acre for the land in controversy, shall be deemed equivalent to such compliance or tender, upon the ground that the State had rendered it unnecessary to make an offer of compliance; because, before Wynn had any opportunity to comply, the State had, by her own voluntary act, abandoned the selection in question, and made another for herself in lieu of it, which she did, according to the statement of Wynn in his bill, immediately after the allowance of Mrs. Taylor's pre-emption by the Register and Receiver, and before the ratification of the arrangement by the Legislature, instead of adhering

to the selection, and protecting Wynn, as he alleges in his bill she ought to have done.

If Morris held his title from the State of Arkansas, instead of from the Federal Government and as against the State of Arkansas, as he does, there would be more reason to suppose that this tender to him was equivalent to the performance, on the part of Wynn, of his alleged agreement with the State of Arkansas, under which he claims that his rights in the premises have grown up. But if it should be so held under the facts of this case, as they exist, then the consequence would be, that in case Wynn had the right, under his alleged contract with the State, to insist that the selection originally made should remain, and as a necessary corollary, that the State had no right to remove it, and make another selection in lieu of it, although with the assent of the Federal Government, and Mrs. Taylor's pre-emption claim should be held bad, then Wynn would get the land in controversy at $2 per acre ; Morris would receive too much and be trustee for the State of Arkansas, for the 75 cents per acre excess, which he would receive from Wynn beyond what he had paid the Federal Government for the land ; the Federal Government would be trustee for the State of Arkansas for the $1 25 per acre received from Morris, and the State of Arkansas would be trustee for the Federal Government for the quarter section of land selected by her in lieu of the land in controversy. And the result would be that there are not enough parties to this suit to enable the court to decree distributive justice.

Hence, the true and first question is, whether or not Wynn did have this alleged right to insist that the original selection should not be withdrawn but adhered to. And as to this, it may be first remarked, that so far from its being pretended that the Governor of Arkansas had, at the time when the alleged agreement was entered into, any authority to bind the State of Arkansas in that behalf, by one of the terms of the alleged agreement itself it was to be dependent for vitality upon the subsequent ratification of the Legislature, which was to give these necessarily admitted un-

authorized acts of the Governor, the force of prior delegated authority. And according to the statements of Wynn contained in his bill, it was before any ratification by the Legislature, and of course before the alleged agreement had any vitality, and when the Governor, so far as the State was concerned, had a perfect right to recede from any unauthorized engagements of his, ostensibly on her behalf, either in whole or in part, that the Governor, (who had authority as to selections under the act of Congress making the grant) withdrew the selection in question, by the assent of the Federal Government subsequently obtained, which of course had relation to the time when the selection in question was actually withdrawn. Consequently, at the time when the selection in question was withdrawn, Wynn had no shadow of right founded upon the supposed agreement, for the simple reason that at that time it had no vitality. And when it was subsequently ratified, it had no vitality as to him, for the reason that when it received vitality from the hands of the Legislature—which of course had relation to the time when it was made—it had nothing to act upon, so far as Wynn was concerned; the selection in question having been in fact, in the meantime, withdrawn under the circumstances mentioned, and left nothing in existence to which the ratification could by law relate, so far as Wynn was concerned. Hence, the result would seem to be, inevitably, that the Governor having equal authority under the circumstances to withdraw the selection at the time he did, that he had to make it originally, the withdrawal nullified the selection. And having receded from his general unauthorized agreement with the planters on Red River, so far as Wynn was concerned as to the tract of land in controversy, before it was recognized by the State, his rescision nullified his opposite stipulation previously made. And the law must therefore contemplate that no selection at all was ever made by the State of the land in question, and that no agreement at all was ever made in the premises, on the part of the State with Wynn.

Hence, Wynn has no base upon which to found his alleged

right to insist that the original selection should not have been withdrawn, but adhered to, even if he had made the State of Arkansas a party to this contest.

As to any rights that he could set up under Mrs. Taylor, it would seem to be at most but the mere right of occupancy of an improvement upon public lands—a chattel interest transferred from her by parol, as the evidence shows him in no otherwise connected with her, giving to it its greatest force in supposing that she sold it to Bales when she first went to Texas.

And this would seem to be manifest from the following considerations. The sale was made in the fall of 1830, or in the spring of 1831, during the life of the pre-emption law out of which Mrs. Taylor's pre-emption right grew. That act, among other things, provided : " That all assignments and transfers of the right of pre-emption given by this act, prior to the issuance of patents, shall be null and void." 4 *Statutes at Large*, *p.* 421.

Upon this provision of the act, the Supreme Court of Alabama held in the case of *McElyea vs. Haxter*, 2 *Porter's Rep.* 148, that a power of attorney executed by the pre-emptor, granting authority to make titles to a purchaser after the patent should have been issued for the lands entered under this act, was void, as a circuitous mode of evading the act of Congress, and that a conveyance, obtained under such a power, was inoperative.

In January, 1832, an act of Congress was passed authorizing pre-emptors under the act of 1830, to "assign and transfer their certificates of purchase or final receipts, and patents may issue in the name of such assignee, any thing in the act aforesaid to the contrary notwithstanding." 4 *Statutes at Large*, *p.* 496.

This act has never been held, so far as we know, to have removed the original inhibition upon the sale of pre-emption rights, further than to authorize their sale after entry, instead of after the issuance of the patent, as originally allowed. And upon this question, in the case of *Terison vs. Martin*, 13 *Ala. Rep. p.* 29, where this point was mooted, that court said : "But no case has been found, and we apprehend none exists, where assignments or

sales of pre-emption rights before the entry was made in the land office, have been upheld." And there are other cases to the same effect.

Besides this, it is not at all probable, in point of fact, that Mrs. Taylor intended to sell a pre-emption right to the land in controversy, or that Bales intended or expected to buy such a right. The lands had not then been surveyed by the Government, and whether or not they ever would be, was dependant upon the doubtful matter, whether they would be found within the territorial limits of the United States, upon the running of the boundary line between this country and Texas, which was not done until some ten years afterwards. Nor had she done any act—nor was it in her power to do any such by reason of the want of the public surveys as a means of identifying her land—indicating an election on her part, to accept the gratuity offered her by the Government and thereby change the character of her occupancy from that of a mere squatter to that of lawful possession, under color of a vested legal right. .

Nor was the sale of her occupancy and improvement at the time she made it, a sale either of the thing out of which her pre-emption right grew, or in which it lived. That right did not grow out of, or live in any occupancy of, or improvement upon the public lands, which existed after the 30th of May, 1830. Occupancy of, and improvements upon the public land, either prior to the time when the law of 1830 would operate upon them, or subsequent to the 30th of May, 1830, were equally incapable of springing up, or sustaining a pre-emption right under the law of that year. That right grew out of facts that were as incapable of being transferred to, and fixed in a purchaser by sale, as yesterday or last week would be. These facts were a cultivation and possession that were past and gone, not a cultivation and possession now existing.

Supposing then, that when, in 1842, Mrs. Taylor elected to accept the bounty of the Government, offered her by the law of 1830, and the supplements thereto, which extended the time for her election up to the time when she made it: that election would

relate back to the inception of her title, (and no doubt it would) and she would, consequently, be bound by any sale she had made in the mean time: still the law would say she had made no sale at all of her pre-emption right, even if she had in fact attempted to do so; because that attempt, in the face of the law to the contrary, would be nugatory. And if the law had not prohibited her, the sale of an improvement upon her lands, which was not, as we have seen, identical with her pre-emption rights—not the thing itself to which the pre-emption right attached, and in which it inhered—was not the sale of that right. There might have been a question of fact, in such a case, as to what she did sell, to be resolved by getting at the true intention of the contracting parties, as there was in the case of *Glanton and Anthony*, decided at the last term of this court, where the purchaser claimed by deed, (and not by parol, as he would have to do in this case) and by that was granted all the "right, title or claim of, in and to an improvement upon the public lands," which the grantor had, he (the grantor) having at the time a clear equitable right to the land upon which the improvement in question was situated, and was holding possession of that improvement by virtue of that right.

But even if this question as to what she really did sell, had been found by a resolution of the intention of the contracting parties, to have been an intention to sell her pre-emption right, that could have been of no avail, unless, according to the principles of equity, a specific performance of that contract could have been enforced. But it is unnecessary to pursue this inquiry further, because, as we have seen, the law did not sanction such a sale of the pre-emption right; and because, also, the complainant seeming to take the same view of the subject, has not framed his bill sufficiently for any relief in this aspect.

And this being therefore but the sale of a mere improvement upon the public lands, and not a sale of the pre-emption right to, or of any lawful interest in the soil as under title thereto—a distinction recognized by our statute, and by repeated decisions of

this court, (some of which are *Pelham vs. Wilson*, 4 *Ark.* 281 ;
*Pelham vs. Floyd*, 4 *Eng.* 530 ; *Brock vs. Smith*, 14 *Ark.* 434,)
it is clear enough, that unless a settler or occupant upon the pub-
lic lands has some right to it, vested under law, he has no cause
to complain of any disposition whatever that the Federal Govern-
ment may make of the land, and no ground for relying, as an
equitable estoppel, upon any act of omission, commission, or bad
faith on the part of the vendee of the Government, which deprives
him of his improvement—he having no rights to be invaded, has
nothing susceptible of injury. The hardship is but that of the or-
dinary case of the entry by one man of another man's improve-
ment upon the public lands.

But supposing Wynn to be in a condition to contest the val-
idity of Mrs. Taylor's pre-emption right, and the grant thereon, it
would seem to be well enough sustained.

She could not have known with certainty of its existence until
the boundary line was run between the United States and Texas,
which was not a great while before she appeared at the Land
Office to prove it up, although she had been absent so long
before.

Her cultivation in 1829, and possession the 29th June, 1830,
seem well enough established: indeed, they were admitted by
Wynn in his correspndence with the Commissioner of the Gene-
ral Land Office, and seem now to be admitted by his counsel.
And her pre-emption right being thus "covered by the law, it be-
came a legal right, subject to be defeated only by the failure to per-
form the conditions annexed to it." And those which were sub-
sequent were but "proof to the satisfaction of the Register and
Receiver of the proper land office, and payment within the time
prescribed by act of Congress. And this having been rendered
impossible by reason of the surveys not having been made and
the plats returned on the part of the Government within that
time, the act of Congress of the 14th July, 1832, afforded her re·
lief, and enabled her to reap the benefits of that of 1830, under
which her rights had vested, to which the act of 1832 was a sup-

plement. *Lytle vs. The State of Arkansas*, 7 *Eng. Rep.*, at *p*. 34 ; *Gaines and others vs. Hale*, (*ante*)

The further supposed condition of continued actual occupancy and possession under the act of 1830, has never been required by the Commissioner of the General Land Office, whose judgment, in the administration of the land laws, is enlightened by the law officers of the Government. And in the case of *Lytle vs. The State*, 9 *How. U. S. Rep.* 314, already cited, which stood on demurrer, the bill contained no such allegation. Whatever evils or hadships may have occasionally resulted to a second settler upon an apparently abandoned occupancy, or to the purchaser of an improvement upon lands to which a pre-emption right had vested, who might occupy and continue to improve the land in the interval between the accrual of the right and its consummation—often protracted to a great length by the tardiness of the public surveys—the courts are not authorized to remedy them by imposing upon the pre-emptor conditions beyond those imposed by the act of Congress, under which his pre-emption right has vested. Nor are such second settlers or occupiers of improvements—who are no other than trespassers—within the saving influence of equitable doctrines, applicable to those who predicate their rights of occupancy upon law. Some of the evils of the earlier pre-emption laws have been remedied by provisions in later ones, experience having shown such evils, and the wisdom of Congress provided against them for the future ; but this can lay no foundation for the courts, when passing upon rights vested under the earlier laws, whose consummation had been for a series of years prevented by the tardy action of the surveying department, to endeavor to provide any like remedies by judicial legislation ; especially for such evils as are the natural result of this very tardiness on the part of the Government. These earlier laws, like that of 1830, were of short duration; and when a right accrued under any of them, it was not possible for the land to which it attached to be kept in a dubious condition as to the intention of the pre-emptor to consummate it or not for an inconvenient time. Under these laws, if he did not make

his proof and payment within the short time provided, his right was forfeited. And it is most reasonbly to be supposed that for the advantages that the Government proposed to reap from these laws, she was willing to submit to the inconvenience of extending to the pre-emptor, the privilege of making his election to consummate his right, or abandon it, at his pleasure, up to the last moment. Hence, the only abandonment or forfeiture that was probably contemplated, was that which was evidenced by a failure to make proof and payment within the time prescribed by the law; and the usages in the General Land Office seem to have conformed to this idea. Even in cases where the pre-emptor had equal right, by virtue of cultivation and possession, to several tracts of the public land, he was not held to have abandoned either, until he had made his election, although at the last moment.

The words used in the act in question, "every settler or occupant of the public lands," are sufficiently broad to embrace aliens as well as citizens, and in administering it, the Land Department made no discrimination, and even extended it to free negroes, when the laws of the State, in which they claimed pre-emptions, allowed them to buy lands. And hence, although Mrs. Taylor might have been an alien, when her pre-emption right was consummated by grant, she had, without the aid of any statute, capacity to take and hold lands until forfeiture in office found. But when her right in this case vested, she was indisputably a citizen, and the grant would relate to that time.

And if after the vesting of her right, and before it was consummated by grant from the Federal Government, she, by the double operation of her own will and the assent of the Federal Government, had become an alien, that would not have worked a forfeiture of the right so already vested. This we understand to be the general principle of law, applicable to the point; and in the case of *Murry vs. Fishback*, 5 *B. Mon.* 406, where one of several heirs had left Kentucky and settled, as he supposed, in Arkansas, but on the line being run between the United States

and Texas, it was found that he was within the boundary of Texas, and he had afterwards moved further into the interior, and still resided in that Republic, the court said: "On these facts it was contended that there could be no recovery to the extent of the interest which had descended to him. But although it is a common law principle, that lands cannot pass by descent to an alien, it has never been decided, and we are not prepared to admit that lands, or a right to lands, already vested by descent in a citizen of Kentucky, is *ipso facto* forfeited, or otherwise lost by his removal to a foreign country and continued residence there, though it be for the purpose and with the effect of expatriation. Lands purchased by an alien born, are not forfeited without office found, and even if Fishback should, upon the facts stated, be adjudged to have voluntarily expatriated himself, and to have become an alien, so far as his civil rights are concerned, still it would not follow that his lease of lands, to which he had a vested right while a citizen, would be void, or that his lessee could not recover."

We have been unable to perceive the force of the distinction taken by counsel between a right and a title, as an avoidance of the effect of these principles of law. They are, perhaps, not entirely convertible terms, because the one savors more of the substance, and the other, more of form. The right, however, may exist in equity, while the title, when acquired, would be the legal evidence of the right, and when emanating from the Government, after various acts following the vesting of the right, and all in consummation of it, as in this case, the issuance of the patent would relate to the time of the vesting of the right, as between the Government and the grantee; and so, also, doubtless, as between the grantee and others not having intervening rights founded upon law.

Finding no error in the decree of the court below, it must be affirmed.

Mr. Justice WALKER:

I fully concur with my brother Scott, in opinion, that before

Wynn could question the sufficiency of Taylor's title, he must first show such title in himself, as, but for the interference of Taylor's claim, would entitle him to the land.

This, in my opinion, he has wholly failed to do; and, consequently, the judgment of the court must be against him, wholly irrespective of the merits of Taylor's title, with regard to which, I decline to express any opinion.

Mr. Chief Justice ENGLISH:

Dissenting from the conclusion to which my brother judges have arrived in this case, as well as from the principal legal propositions upon which brother *Scott* bases the result, in the opinion just delivered by him, I deem it my duty to express briefly the grounds of non-currence, with all due deference to the judgment of my associates. Understanding, however, that the case will be taken to the Supreme Court of the United States, where the questions involved will be finally and authoritatively settled, I deem it unnecessary to go at any length into the reasons and adjudications upon which my conclusion is founded.

My opinion is, that Morris holds the naked legal title to the land, based upon a supposed pre-emption right in Mrs. Taylor, which, by both sale and abandonment of her improvement, was destitute of legal foundation or merit as to her. That she having sold her improvement, and abandoned the land, and the Territory of Arkansas, and being a citizen of Mexico, when the act of 14th July, 1832, (4 *vol.*, *U. S. St. at Large*, *p.* 603,) was passed, and this act applying only to continuous settlers or occupants, who had been unable to prove up their pre-emptions under the act of 29th May, 1830, on account of some one of the obstructions therein enumerated, she was not in a position to derive any benefit from that, or any subsequent act applying to occupants. That she placed herself without the pale of the spirit and policy of the pre-emption system, which was designed to encourage the settlement of the public lands, and the improvement of the country by a resident population.

That this (in my judgment) meritless pre-emption, (as to her)

was thrust in between Wynn and the State to defeat the arrangement which he had made with the Governor to secure title to the land, which was possessed and cultivated by Wynn, and he was thereby prevented from obtaining the legal title through that channel. That upon all the facts of the case, he is entitled, in equity and good conscience, to have the naked legal title held by Morris and based upon Mrs. Taylor's supposed pre-emption right, divested, and transferred to him upon payment of the entrance money.

That the United States having sold the land, and received the entrance money, has no interest in the controversy. That the State is not a necessary party; because, though she selected the land as part of the 500,000 acre grant, and acquired thereby a right thereto, yet in consequence of the sale of it to Mrs. Taylor by the procurement of Morris, other land was selected, it seems, by the State in its stead. The State is not injured. Nothing could be decreed to or against her. Wynn is the only injured party, and Mrs. Taylor and Morris, being the agents who procured the injury, the relief which he seeks may be made full and ample, without other parties than them. It can scarcely be doubted but that Wynn would have procured title to the land, through the State, by means of the arrangement which he made with the Governor, and which was afterwards ratified by the General Assembly, but for the interposition of Mrs. Taylor's unfounded claim to a pre-emption. He having acquired title to her improvement by a succession of transfers, and she having abandoned the land and the country, and permitted him to occupy, cultivate, and improve the same, was thereby estopped from setting up any pre-emption claim thereto for her own benefit. But she and Morris interposing her groundless claim, to defeat the arrangement which Wynn had made to procure title to the land, and which he would doubtless have secured but for their acts, I think it but just and right, and perfectly within the power of the court of equity, to transfer the legal title from Morris to Wynn, under all the circumstances of the case, as made by the pleadings and evidence.