## RECTOR ET AL. vs. GAINES ET AL.

The decision in *Gaines et al. vs. Hale,* (16 *Ark. Rep.*9,) that the Receiver's receipt and certificate of purchase by a pre-emption claimant, though accompanied by a note, under the direction of the general land office, that the pre-emption interferes with other claims to the same land, is sufficient evidence of legal title to sustain an action of ejectment: and that such title cannot be impeached by evidence tending to show that, upon the merits, a pre-emption ought not to have been allowed the plaintiff, or that other persons had superior equitable claims to the land, approved and adhered to.

A sale of the public lands, by the executive of the federal government, before the public surveys, may be treated as void: But if the public survey be regularly made, returned and approved, a sale would be valid, although the survey be defective or erroneous, if such defect does not render the identity of the tract uncertain as to locality or quantity.

A pre-emption right constitutes a specific claim to the particular tract of land from the very first inception of the claim; but a New Madrid float or certificate constitutes no claim to any particular tract of land until it has been lawfully located.

A location of a certificate under the New Madrid Acts, is the actual survey of the land and return of the plat by the surveyor to the Recorder of land titles, and its approval on the part of the Government—until such survey, return and approval the title remains in the Government.

Under the provisions of the statute (*Dig. ch.* 60, *sec,* 13,) the plaintiff in ejectment, claiming possession under a patent certificate, whether as purchaser of land that has been publicly offered for sale, or under the pre-emption laws of Congress, is not entitled to recover rents and profits for improvements made by the defendant or those under whom he claims; and any evidence conducing to prove that the improvements were made by the defendant is admissible to defeat the claim for rents and profits.

*Appeal from the Circuit Court of Hot Spring county.*

The Hon. JOHN C. MURRAY, special Judge, presiding.

CUMMINS, FOWLER and HEMPSTEAD for the appellants.

WATKINS & GALLAGHER, for appellees.

Mr. Justice SCOTT delivered the opinion of the Court.

This was an action of ejectment, under the provisions of our statute authorizing such actions upon entries made with the Register and Receiver, pre-emption rights, etc., brought by the appellees, as heirs at law of Belding, against the appellants, for the recovery of certain premises included within the SW¼ of section 33, T. 2 S. R. 19 west.

Having otherwise made out their case, the plaintiffs below offered and read in evidence, against the objection of the defendants, the same Receiver's receipt and documents referred to therein, that were held to be admissible by the Court, to sustain a like action, in the case of *Gaines et al. vs. Hale,* 16 *Ark. Rep.* 9, (where they are set out *in extenso*) and then rested their case.

The defendants then offered to read in evidence an authenticated copy of certain certificates and documents, objected to by the plaintiffs upon the merits only, and which are as follows to wit:

" No. 435.      OFFICE OF THE RECORDER OF LAND TITLES, <br>
                         *St. Louis, Missouri,* <br>
                            June 16th, 1838.

I certify, that in pursuance of the act of Congress, passed the 17th day of February, 1815, a location certificate No. 467, issued from this office in favor of Francis Langlois, or his legal representatives, for two hundred arpens of land; that a location has been made, as appears by the plat of survey herewith, and that the said Francis Langlois, or his legal representatives, is entitled to a patent for the said tract, containing, according to said location, one hundred and seventy acres and fifteen hundredths of an acre, situated in the State of Arkansas, the township and range not mentioned. Survey No. 2903.

                 F. R. CONWAY, *U. S. Recorder of* <br>
                    *Land Titles in the State of Missouri.*

*To the Commissioner of the* <br>
           *General Land Office, City of Washington.*

---

GEN. WILLIAM RECTOR, *Surveyor, etc., of the Public Lands of the State of Illinois, and Territory of Missouri:*

The undersigned applies for the entry or donation of two hundred arpens of land, to satisfy a certificate issued by Frederic Bates, esq., Recorder of land titles for the Territory of Missouri, to Francis Langlois, or his legal representatives, dated the 26th November, 1818, and numbered 467, to be surveyed in a square tract, the lines of which to be corresponding with the cardinal points, and to include the Hot Springs (so called,) upon the waters of the Ouachita river, south of the river Arkansas; the said springs to be as near the centre of the square as circumstances will admit. An order of survey is solicited, and directions agreeably to this notice. The springs so to be included, are those generally known as the largest and most resorted to upon that river.

                       S. HAMMOND, <br>
                       ELIAS RECTOR.

ST. LOUIS, 27th January, 1819.

CERTIFICATE No. 467, SURVEY 2903.

Surveyed for Francis Langlois or his legal representatives, who claims location by virtue of certificate No. 467, issued by Frederic Bates, Recorder of Land Titles, on the 26th Nov., 1818, two hundred arpens, equal to one hundred and seventy and fifteen hundredths acres of land, beginning at the main Hot Spring of Arkansas, thence S. 45 deg. E., on an unmarked line 29.17 chains, where set a post the south-east corner of said survey, from which, a pine 24 ins. dia. bears N. 7 deg. E. 40 lks., and pine 16 ins. dia. bears N. 67 deg. W. 53 lks., each marked P. S. & B. T., thence North (with line of survey,) at 204 lks. a white-oak. 13 ins. dia., at 41.25 chs. set a post the north-east corner of said survey, from which, a pine 16 ins. dia. bears N. 45 deg. E. 15 lks., and a black-oak 8 ins. dia. bears S. 68 deg.

74      CASES IN THE SUPREME COURT

Rector et al. vs. Gaines et al.      [JULY

W. 15 lks. each marked P. S. & B. T., thence west at 355 lks., a white-oak 24 ins. dia.; at 41.25 chs. set a post the north-west corner of said survey, from which, a white-oak 16 ins. dia. bears N. 10 deg. E. 48 lks., and white-oak 18 ins. dia. bears S. 58 deg. E. 56 lks., each marked P. S. & B. T.; thence south at 60 lks. a white-oak; at 12-10 chs., Hot Spring creek bears east; at 41.25 chs. set a post the south-west corner of said survey, from which, a black-oak 6 ins. dia. bears N. 48 deg. E. 21 lks., and a black-oak 10 ins. dia. bears N. 28 W. 50 lks.; thence east at 563 lks. a black-oak 12 ins. dia.; at 18.87 chs. Hot Spring creek bears south; at 41.25 chs. the south-east corner of said survey.

In conformity with instructions from the Surveyor General, I have surveyed the foregoing location or claim in the name of Francis Langlois, so that the main Hot Spring is the centre thereof.

JOHN C. HALE, <em>D. S.</em>

*28th February*, 1838.

———

SURVEYOR'S OFFICE,    ⎫<br>
<em>Little Rock, Ark.</em>,   ⎬<br>
23d April, 1838⎭

The foregoing writing is a true copy of the location, plat and survey of two hundred arpens of land, by virtue of certificate No. 467, on file in this office, the survey of which has been examined and approved.

EDWD. CROSS, <em>Surveyor</em><br>
<em>of Public Lands.</em>

To FREDERIC R. CONWAY, *U. S.*
<em>Recorder of Land Titles,</em><br>
St. Louis, Missouri.

RECORDER'S OFFICE,
St. Louis, Missouri,
16th, June, 1838.

The foregoing is truly recorded on pages 42 and 43, of book G. of record in this office. The number of survey was obtained by me from the Surveyor's office, at St. Louis, and inserted.

F. R. CONWAY, *Recorder of Land Titles in the State of Missouri.*

GENERAL LAND OFFICE.

I, JAMES SHIELDS, Commissioner of the General Land Office, do hereby certify that the foregoing, on pages 1, 2, 3 and 4, are true copies of the papers on file in this office.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name, and caused the seal of the said office to be affixed, [SEAL.] at the City of Washington, the second day of July, 1845.

JAS. SHIELDS, *Commissioner.*

The Court sustained the objection of the plaintiffs to the introduction of the foregoing documents offered by the defendants, and refused to permit the same to be read upon the distinct ground that they were not evidence of title in Francis Langlois to the premises in controversy.

The defendants then offered to read in evidence the record of the proceedings and decree in a suit on the chancery side of the Hot Spring Circuit Court, instituted on the 21st of July, 1852, by Henry M. Rector, against Francis Langlois, Joseph Story, Samuel Hammond and Eliza A. Hammond, or their unknown heirs, if they be deceased, averred to be all unknown to the complainant, and non-residents of the State of Arkansas; the object of which was to divest Francis Langlois, and the other

76     CASES IN THE SUPREME COURT

Rector et al vs. Gaines et al.     [JULY

defendants in that suit, of whatever title Langlois may have acquired by virtue of the alleged location of his New Madrid claim upon the Hot Springs of Arkansas, including a portion of the SW. qr. of sec. 33, and to vest the same by decree of the Court in the complainant, Rector, who claimed as surviving residuary devisee under the will of his father Elias Rector. The Court below, upon the objection of the plaintiffs, refused to permit the record of such suit to be read in evidence.

The defendants then offered to read in evidence the following paper, as an original survey of the alleged New Madrid location of Francis Langlois, coupled with an offer to prove that it had been actually made and marked upon the land, as represented in said paper, viz:

SURVEY 2903, No. 467.

Survey for Francis Langlois, or his legal representatives, 200 arpens of land located by virtue of New Madrid certificate.

Beginning at a post from which a pine (marked thus, H. & R.) bears S. 47 deg., East 8 links, thence south 7 chs. a creek 15 lks. wide, runs east, at 41.25 chs., set a post, from which, a pine 15 ins. in dia., bears N. 47½ deg. E. 23 lks.; thence east 19 chs. 25 lks. to Hot Spring creek, 25 lks. wide, runs south, at 41.25 lks. set a post, from which, a post-oak 10 ins. in dia. bears S. 84 deg. E. 0 lks.; thence north, at 41 chs. 25 links set a post, from which, a red-oak 6 ins. in dia. bears S. 62 deg. west 16 links thence west 41 chains and 25 links to the beginning.

JAMES S. CONWAY, *D. Surveyor.*

JULY 16th, 1820.

But the same being objected to on the part of the plaintiffs, was excluded by the Court.

The defendants then offered in evidence, a copy of the plat of a portion of T. 2 S. R. 19 W., with accompanying field notes, it being admitted by the plaintiffs, for the purposes of that trial, to be the only public or official survey ever made and approved under the authority of the United States, of said township, including the land in controversy, viz:

*Township* 2 *South Range* 19 *West.*

78          CASES IN THE SUPREME COURT

Rector et al vs. Gaines et al.                    [July]

SURVEYOR'S OFFICE,
*Little Rock, Ark..*
25th Aug., 1855.

I certify that the above plat or diagram of sections 32 and 33 T. 2 S. R. 19 W., is a true copy from the original plat on file in this office.

H. M. RECTOR, *Sur. Gen'l.*
JOHN HUTT, *Chief Clerk.*

Which was, in like manner, objected to by the plaintiffs, and excluded by the Court.

The defendants then offered to read in evidence to the jury, a copy from the record of deeds, of a paper and the certificates accompanying the same, purporting to have been executed by L. Belding to John Percifull, and dated in 1831, purporting to be a declaration of Belding, that he had no right to the possession of Hot Springs or the buildings there, except under Percifull, and that the same were to be surrendered to him, etc., coupled with an offer, on the part of the defendant, Rector, to make affidavit that the original of said paper never was in his possession, and that the same was lost or mislaid, and coupled with the further offer to prove orally, that Belding, in his life time, had acknowledged said instrument to be genuine, and that it had been delivered by him to Percifull in his lifetime, etc. The Court refused to permit the paper so offered to be read as evidence.

The defendants next offered to read in evidence a paper certified on the 12th of June, 1855, by the then Surveyor General of Arkansas, purporting to be a copy of a list of New Madrid certificates and locations made in the Territory of Arkansas, transmitted with other books, papers and documents, from the surveyor's office in St. Louis, to the Surveyor General's office in Arkansas, on its organization in 1832, in which list appears to be included the claim of Francis Langlois. This paper was also excluded on the objection of the plaintiff.

The defendants then offered to prove by a succession of leases

and transfers, that they were the owners of all the right of John Percifull to the land in controversy, and held under him, as their predecessors in possession had done, but the Court refused to permit such proof to be introduced.

The defendants then introduced several witnesses, who testified as to the value of the rents of the premises in question, and whose testimony conduced to discriminate between such improvements in the Hot Spring valley, and the value of them, as had been made prior to the entry of Belding's heirs, on the 19th of December, 1851, and those made since; and also, to show what buildings had been erected since the commencement of the present action—which was all the evidence adduced or offered on the part of the defendants.

Adhering to the decision of this Court in the case of Gaines et al vs. Hale, as to the admissibility of the Receiver's receipt, and the accompanying documents referred to therein, we think the Court below ruled correctly in this case in overruling the objection of the defendant in that connection.

These accompanying documents referred to upon the face of the Receiver's receipt, and thus in substance a part of it, serve as well to indicate the origin of the appellee's claim to the land purchased thereby as the design and end of the General Government in allowing the purchase; the ultimate control of which was reserved for the future action of the executive department, after the judicial should have passed upon the lawful claims of all persons whomsoever to the land, who might prefer them to the Courts for adjudication.

Under our statute, this entry of the land in question, thus shown, was sufficient legal evidence of title in the plaintiffs to sustain their action of ejectment, and was not subject to be impeached by the introduction of evidence on the part of the defendants tending to show that upon the merits of their claim a pre-emption ought not to have been allowed the plaintiffs, or that other persons had superior equitable claims to the land. (*Gaines et al. vs. Hale*, 16 *Ark. Rep.* 25.) Hence, the defence, to be successful in this action, when based upon a conflicting claim

to the land in controversy, must rest upon a legal title, and not upon any equitable one, unless within the perview of our statute creating the remedy. (*id*.) Other equitable claims to the land would, doubtless, be cognizable in a Court of equity, should the Federal Government submit absolutely all her right in the premises to the Courts, or pass the absolute and complete title to the land to some one of the contending parties, so that the chancellor might distribute ample and complete justice among all the several parties. Whether, until this be done, that Court would interfere, and if so, to what extent, we are not now called upon to determine in this Court of law.

Our duty at present is to determine the relative legal rights of these parties, plaintiffs and defendants, as they are presented in this action and appear in this record, involving also, incidentally, to some extent, the legal rights of the Federal Government, although no party to this suit, as the seeming unavoidable result of the action of the executive, in allowing the plaintiffs' pre-emption claim, and the entry of the land, over the objection of its reservation from sale, entry, or other disposition during the pleasure of the Congress, under their act of the 20th of April, 1832. Because if this act is operative as against the plaintiffs' claim to a pre-emption, its allowance and the entry of the land were illegal and void for want of power in the executive to sell the land in question. That point was considered by this Court in the case of Gaines et al. vs. Hale, where it was insisted that the allowance of the pre-emption claim of Belding's heirs, and their entry of the land were absolutely void for this, among other reasons. But following the lead of the Supreme Court at Washington, as the authoritative expounder of the Acts of Congress, we held, as that Court did, in the case of *Lytle vs. The State*, 9 *How. Rep.* 314, under a state of case more emphatically against such an idea—because there, there was an absolute grant of the land by Congress, and not a mere reservation of it, as here—that the pre-emption right of Belding operated as a prior and intermediate appropriation of the land, having relation to the pre-emption act of the 29th May, 1830, at which time the

right vested, though subsequently perfected under the act of Congress of the 14th July, 1832. The same construction we have since applied in the case of *Wynn vs. Morris*, 16 *Ark. Rep.* 414, and *Lytle vs. The State*, 17 *Ark. Rep.*

We are free to say, however, that in this construction, which we shall also apply in the case before us, and which necessarily excludes any operation of the reservation act of Congress in question against the claim of Belding's heirs, we have been always far more influenced by the decision of the Supreme Court at Washington, to whom we have yielded as the constitutional expounder of the acts of Congress, than from the deliberate and clear convictions of our own minds.

In this connection it will, perhaps, be most convenient to notice another objection to the plaintiffs' case, predicated upon the offer of the defendants to introduce in evidence a certified copy of the plat of a portion of T. 2 S. of R. 19 W., with accompanying field notes embracing sections 32 and 33, in connection with the admission, on the part of the plaintiffs, that that was the only public and official survey ever made and approved under the authority of the Federal Government of the township including the land in controversy.

It appears upon this plat, that the public survey closed upon a square survey of the supposed location of Langlois, which embraces portions of these two sections, and included the point on the line between them, where the quarter section corner would have been established, had the entire line between these two sections been run and marked, instead of having been closed on this survey of the Langlois claim, as thus appears to have been done. It appeared otherwise, however, that although this was so, the four corners of section 33 were established by the Government surveyors, and three of the half mile corners fixed as represented on the map, and that, also, in fact, all the external lines of that section were run, and the remaining half mile corner established, although these did not appear on the plat, and that, with such *data* before him, a competent surveyor could run out and ascertain the identity of the quarter section

of land in question with as unerring accuracy as if that portion of the west line of the section, which was included within the New Madrid survey, and on which the half mile corner would appear, had been represented on the plat: and also, that in the public surveys fractional sections are thrown upon the northern and western tier of sections in each township; so that, in this instance, the quarter section in controversy must of necessity have contained neither more nor less than 160 acres.

The Court below, we think, ruled correctly in excluding this evidence, because, according to the opinion of this Court, in the case of *Gaines et al. vs. Hale,* unless an objection to the entry of Belding's heirs should go the length of authorizing the Court to hold it absolutely void, it would amount to nothing in this proceeding. And although we concede the general proposition, that a sale of the public lands by the executive, before the public surveys, may be treated as void, because contrary to positive provision of law, yet it cannot be within the policy of the land laws of Congress and consistent with their true meaning and intent, to deprive the executive of the power of sale merely because a public survey regularly made, returned and approved, may be defective or erroneous, when such defects, whether from ignorance or design of the officers of the surveying department, do not render the identity of the tract, defectively surveyed, at all uncertain as to locality or quantity—the survey furnishing ample *data* for both to be fixed with accuracy, without the slightest danger of encroaching upon another adjoining tract, as in the survey in question.

With this understanding of the case made by the plaintiffs below—and of so much of the law governing this proceeding as we have noticed—we shall proceed to that presented by the evidence, offered on the part of the defendants, which the Court excluded. And the material question to be solved in this connection is, whether the claim of Langlois to the premises in question, which Rector thus offered to set up, has, upon the evidence presented, a legal foundation to stand upon, sufficient to displace, in this action, that of the plaintiffs below upon

which they proceed.  It is the controling point in the case.
There are other questions presented by counsel, but they are
subordinate to this, and some of them dependent upon it.

The New Madrid patent certificate offered in evidence under
the act of our Legislature of the 10th of January, 1853—author-
izing actions of ejectment in the Courts of this State upon such
documents—refers upon its face to other documents, which were,
also, along with it, offered in evidence.  The whole, together,
indicate the origin, and present the foundation upon which the
claim rests.  It grew out of the act of Congress of the 17th Feb-
ruary, 1815, authorizing persons owning lands in the county of
New Madrid, and materially injured by earthquakes to locate
the like quantity of land on any of the public lands of the Ter-
ritory, " the sale of which is authorized by law."

Under this act the usual certificate was issued to Langlois to
the effect, that he was one of the sufferers, and therefore en-
titled to locate a quantity of land mentioned therein, according
to the provisions of the act.  Whether this certificate was so
proceeded upon as to create in Langlois, and those claiming
under him, a specific claim to the premises in controversy, such
as a Court of law can recognize, under the rules before men-
tioned for the conduct of their proceedings, and of the grade in-
dicated, is necessarily the vital enquiry.  If the New Madrid
patent certificate, as the consummation of the previous steps re-
quired by the New Madrid acts, vested in Langlois a title,
which the Court could recognize, superior to that acquired by
the heirs of Belding under their pre-emption entry, of course the
latter must fail in their action; otherwise they must succeed.

Other things being equal, to make the claim of Langlois su-
perior to that of Belding's heirs, it is not only necessary that it
should have originated prior to the 29th of May, 1830—the day
to which the entry of Belding's heirs relates—but that it should
have been lawfully fixed upon the premises in question, specifi-
cally, prior to that day.  Until then there could be no vested
right to any particular tract of land under a New Madrid float,
in the very nature of the claim; and consequently a claim to

any specific tract of land could not relate to any prior act, in a series necessary to complete a title under such a claim. On the other hand, a pre-emption right, when not a float, constitutes a specific claim to the particular tract from the very first inception of the claim. It grows out of the particular tract of land cultivated and occupied at the time contemplated by the act of Congress which creates it, and inheres in that tract. The floating right, on the contrary, constitutes a specific claim to the particular lands on which it may be located, not from the inception of the claim located, but from the time of its location. Before that time it was but a warrant, or authority to locate the quantity of land allowed.

At what point of time, then, the claim of Langlois was lawfully fixed upon the premises in question, becomes a material question: and this must be determined by the New Madrid act, as interpreted by the Supreme Court at Washington, applied to the facts offered to be shown in evidence.

The act itself is quite explicit on this point, and the language of the Supreme Court even more clear and distinct. The second section of the act explains the location contemplated by Congress, in that act of grace and favor to the New Madrid sufferers, in the following words: "And upon such certificate being issued, and the location made on the application of the claimant by the principal deputy surveyor for said Territory, or under his directions, whose duty it shall be to cause a survey thereof to be made, and to return a plat of each location made, to the said Recorder, together with a notice in writing, designating the tract or tracts thus located, and the name of the claimant on whose behalf the same shall be made, which notice and plat the said Recorder shall cause to be recorded in his office. *. * *

"SEC. 3. That it shall be the duty of the Recorder of Land Titles, to transmit a report of the claims allowed and locations made under this act, to the Commissioner of the General Land office, and shall deliver to the party a certificate stating the cir-

cumstances of the case, and that he is entitled to a patent for the land designated," etc, (3 *Stat. at Large p.* 211.)

And the Supreme Court, in the case of *Bagnell vs. Broderick,* (13 *Peter's Rep.* 436, 447, 450,) say: " The United States never deemed the land appropriated until the survey was returned, for the reason that there were many titles and claims, perfect and incipient, emanating from the provincial governments of France and Spain, and others from the United States, in the land district where the New Madrid claims were subject to be located. So there were lead mines and salt springs excluded from entry. Then, again, the notice of entry might be in a form inconsistent with the laws of the United States; in all which cases, no survey could be made in conformity to it. * * *

" The location referred to in the act is the plat and certificate of survey returned to the Recorder of Land Titles; because by the laws of the United States, this is deemed the first appropriation of the land, and the Legislature of Missouri has no power, had it made the attempt, to declare the notice of location filed with the Surveyor General to be an appropriation, contrary to the laws of the United States."

Again in *Barry vs. Gamble* (3 *How. Rep. p.* 84,) the Supreme Court, speaking of the Recorder's certificate to Lefleur for 640 acres of land in compensation for land injured by the earthquake in New Madrid county, said: " On this the survey of April, 1815, is founded. Its return by the surveyor with a notice of location to the Recorder, was the first appropriation of the land, and not the notice to the Surveyor General's office requesting a survey to be made, as this Court held in the case of *Bagnell vs. Broderick,* 13 *Peter's Rep. p.* 450."

Again in *Lessieur vs. Price,* 12 *How. U. S. R. p.* 60, affirming the same case, 12 *Missouri Rep. p.* 14, the Court decides that a New Madrid location, though a proffered bounty to, and at the option of, persons whose lands were injured, is nevertheless upon a consideration, being an exchange of lands. The title of the injured lands does not revert to the United States, according to the terms and obvious construction of the act of 1815, until

the location is completed by the return of the survey, and notice to the Recorder of Land Titles, and a record of it made in his office; and until this is done, no title is divested out of the United States, or vested in the locator, and the land remains the property of the United States subject to be appropriated, etc., and the Court further say, in that case, that this is the meaning of the statute of Missouri authorizing those claiming lands by "New Madrid locations" to maintain ejectment; that is to say, a location, which is an appropriation of the land, perfected in the Recorder's office, when the exchange of titles takes place.

There are several other authorities cited by counsel, which, we think, in their legitimate bearing, are to the same effect. The true question on the point, is not what is a location in general, or what is, in general, the proper signification of that word; but what is the location contemplated by the New Madrid acts? and we feel constrained to hold, that, according to these authorities, and not, as we think, at all inconsistent with the plain language of the acts, and certainly in accordance with a safe and wise policy on the part of the government, that location was the actual survey and return of the plat by the surveyor to the Recorder. Until such return and its approval on the part of the government, there was no commencement of right or title to the land applied for, no severance of it from the public domain. Then, for the first time, rights to the respective lands exchanged vested respectively. Before that point of time either party could recede. It was a standing offer on the part of the government, which the New Madrid sufferer might accept or not at his election. If he elected to accept it, that election was shown, not by the acts of the party alone, but by the concurrence in the act on the part of the Government upon the terms and in the mode prescribed by the act of Congress tendering the bounty. Until this concurrence thus manifested, no rights could vest, cognizable in a Court of justice. If any arose in honor and conscience they rested in entreaty. The government undertook to dispose of her own lands upon her own terms. If the New Madrid sufferer undertook to acquire them under the offer on

the part of the government, he could do so, only, when these terms were all fully complied with, whether within his own control or not. Until then the government did not part with her lands, nor he acquire them—no rights vested, cognizable in a Court of justice. If intermediate the application of the New Madrid sufferer for the benefits of the act of Congress, and pending the needful steps resulting, when completed, in the securing of the bounty of Congress, the government should sell, patent, or take in reserve for the uses of the government, the land applied for and contemplated to be acquired by the New Madrid sufferer, no legal rights were invaded, because none had been created under the terms of the act of Congress, of the provisions of which the sufferer had sought in vain to avail himself—that very contingency having been contemplated, according to this construction of the act, in making this bounty subordinate to the paramount policy of the government in reference to the disposition of the public lands, and the security of land titles; and, especially, the Supreme Court say, in the quotation already made, because there were many titles and claims perfect and incipient, emanating from the provincial governments of France and Spain, and others from the United States in the land district where the New Madrid claims were subject to location. •So, there were lead mines and salt springs excluded from entry. Then, again, the notice of entry might be in a form inconsistent with the laws of the United States; in all which cases no survey could be made in conformity to it.

Hence, if vested rights were allowed to grow up, previous to the return and approval of the survey, a great field of litigation would be opened, which sound policy dictated should not be done; an evil which is beginning to be too sensibly felt in the land States, in reference to the policy and construction of the pre-emption laws of Congress, as expounded by the Supreme Court at Washington, whereby confidence in land titles derived from the government has been, in no little degree, impaired. Nor was there any hardship, at all comparable with this great evil, growing out of the sounder policy of the New Madrid acts;

which vested no rights—and hence allowed either party to recede from the contemplated exchange of lands—at any time previous to the final consummation of the proposed exchange by the return and approval of the survey, afterwards to be perfected by grant on the part of the government.

When these doctrines are applied to the New Madrid claim offered to be set up by the evidence in question, it is clear that the claim of Langlois, if in other respects properly proceeded upon, was not specifically fixed by location upon the premises in question until the year 1838, when the survey was made by Hale, deputy surveyor, the 18th of February of that year, approved by Cross, the surveyor of public lands, 23d April of the same year, and afterwards, on the 16th of June next following, recorded in the office of the Recorder of Land Titles in the State of Missouri, who, that day, thereupon issued the patent certificate in question. At that time the tract of land in question was not subject to be located in satisfaction of the claim of Langlois, not only because of the prior vested rights therein of the plaintiffs below, under the pre-emption act of 1830, upon which they have been permitted to enter it, in the land office, and receive the patent certificate, upon which they proceed in this action; but also, because it had been previously,—by the act of Congress of the 20th of April, 1832—reserved for the future disposal of the United States, so as not to be " entered, located, or appropriated for any other purpose whatsoever." An act unquestionably operative as against the claim of Langlois, unless he, or some person lawfully holding under him, through whom Rector derives his claim, had appropriated the land according to law prior to the date of the act of Congress in question.

And of this there is no pretence, otherwise than by means of the alleged original survey made by James S. Conway, deputy surveyor, the 16th of July, 1820, offered to be read in evidence as such, coupled with an offer to prove that it had been actually made and marked upon the land, as represented in the paper offered as such survey, purporting to be signed by the said deputy surveyor. There was no offer to prove that that survey

was ever returned and approved, or in any way otherwise re-
cognized on the part of the government, other than by the pat-
ent certificate of the Recorder of Land titles in the State of Mis-
souri, of the 16th of June, 1838, already noticed, which, we
think, was manifestly predicated upon the approved survey of
Hale in 1838, and not of the alleged survey of Conway in 1820,
which does not appear to have been ever perfected into a loca-
tion according to the New Madrid acts. It therefore fell short
of proving any such prior appropriation of the land to the claim
of Langlois, and was properly rejected by the Court below as
having no legal foundation to stand upon.

Could the Chancellor take jurisdiction in the present condition
of these conflicting claims to the land in controversy—as to
which we desire to be understood as intimating no opinion what-
ever—whether, upon any showing, short of a full compliance
with the New Madrid acts, as we have understood them to be
authoritatively interpreted, he would depart from their policy
as thus interpreted, and not only set up this alleged survey as a
location, but make it relate back to the date of the same, and
thus, upon the idea that rights to the specific land then vested,
displace the claim of Belding's heirs, as well as the operative
force of the reservation act of 1832, as against the Langlois
claim, are questions which are not presented to us upon this
record, and as to which we intimate no opinion. It is the case
before us that we undertake to decide, whatever may have been
the scope of the argument of counsel.

It follows from the foregoing examination of the controling
point in the case, that upon the evidence offered, the claim of
Langlois had no legal nor equitable foundation to stand upon,
sufficient to defeat the action of the plaintiffs below. The New
Madrid patent certificate was, therefore, properly rejected by
the Court below as well as all the other evidence in support
of it.

There are other questions urged against the validity of the
claim of Langlois, that would seem worthy of serious consider-

6

ation.   But it is unnecessary to look into them since that, that we have already sustained, is decisive of the case.

With regard to the other evidence offered, it was all properly rejected, with the exception of so much of it as conduced to prove that the improvements upon the land sought to be recovered, were " the improvements of the defendant" in the statutory acceptation of that phrase.   (*Dig. ch.* 60, *sec.* 13 *p.* 456.)

The proof of conveyances, successive leases and of accordant occupancy of the improvements in question by the defendants under the claim of Perciful certainly tended to this point.   Of course, unless it had been, also, proven that Perciful had some legal right sufficient to defeat the plaintiff's action, such evidence would have been inadmissible to prevent a recovery of the premises: nevertheless, under the provisions of our statute affording the remedy which the plaintiffs were pursuing, it was admissible to prevent a recovery, *in that action*, of rents and profits.

At common law, the recovery of rents and profits was not an incident to the action of ejectment.   The damages thus recoverable were but nominal.   But our statute gives this further remedy, or extension of it; and it is the same statute upon which alone the plaintiffs predicate their standing in Court: a standing unknown to the common law, and which, at best, is a precarious one, since the certificate of purchase, upon which they proceed, is not only by general law and usage, but by express reservation, in this instance, revocable in the sound discretion of the President, at any time before being perfected by grant.

It would be going a great way to say, that the plaintiffs should be allowed the use of this extraordinary remedy, and not be bound by the limits fixed by the legislature for the recovery therein: that they might be permitted to avail themselves of all its provisions to their advantage, and repudiate those that should deny them all, that they might desire or be entitled to under different circumstances.   It would be far more reasonable to say, if they should elect to avail themselves of the provisions of

the statute in their favor, they must abide by them all as one entire act, which, at the same time that it affords an extraordinary remedy, fixes limits to its scope.

It is beyond doubt, in our opinion, that an entry under the pre-emption laws of Congress was as fully within the intention of the legislature as the ordinary entry of lands that had been previously offered at public sale, and were subject to private entry, and to which no pre-emption right attached. The evil manifestly designed to be remedied, and the public good contemplated, were, beyond question, the same in both cases. There can be no shadow of difference as to this. The act was but to make the omnipotence of the public will speak in the form of law. The sentiment thus embodied in a different form, was the very source from which the pre-emption laws themselves arose. Men have ever felt, and will always feel, that when they have encountered the privations and toils incident to the pioneer of our settlements, and infused their labor into the soil of the wild lands of the government, that they have sown the seeds of the better title. It is true, they have mixed their labor, which was their own, with the soil, which was the government's, and they have done so knowingly; but it was their own government. The pioneer appeals to this government, upon the inherent justice of his case: Congress responds by allowing the senior settler the preference of entry; and our legislature, by protecting the junior from all but an ouster according to law. Until then he may enjoy the fruits of his own labor, although improvidently mixed with the lawful rights of another: until then, he may go quit of rents and profits, if the senior elects to eject him by an action at law, in advance of his perfection of his entry by grant. The artificial legal reasoning, on which the opposite construction is based, is incomprehensible to the pioneer. He never heard of inchoate vested rights; nor of the legal doctrine of relation. Nor were these doctrines contemplated by the legislature, who but intended to respond to the actual state of the case, with no view to these doctrines of the law.

Holding this to be the true interpretation of the provision of the statute in question, we think the Court erred in rejecting the evidence on this point, as well as upon the same question also raised on the instructions given and those refused: and for this error the judgment must be reversed and the cause remanded, unless the appellees should elect to enter of record a remittitur as to the rents and profits recovered, upon the terms prescribed by the rule of Court adopted in the case of *Fowler vs. Johnson*, 6 *Eng. Rep. p.* 200; in which event the judgment will be affirmed.

Mr. Chief Justice ENGLISH, not sitting in this case.